UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10151-RGS
CRIMINAL ACTION NO. 99-10098-RGS

STEPHEN ROSSETTI

v.

UNITED STATES OF AMERICA

MEMORANDUM AND ORDER ON
PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

January 9, 2012

STEARNS, D.J.

Stephen Rossetti brought this *pro se* petition seeking to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The case arose out of an aborted plot to rob a Loomis armored car facility in Easton, Massachusetts. Rossetti alleges that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment. As a separate matter, Rossetti contends that the recent vacatur of one of his prior convictions in state court requires a reduction of his total sentence.[1] For the reasons to be stated, Rossetti's motion will be DENIED.

BACKGROUND

On October 24, 2001, following a four-week jury trial, Rossetti was convicted on all six counts of the underlying indictment: conspiracy and attempted robbery, in

---

[1] As will be explained, this vacated state conviction was one of three prior convictions cited by the government in urging the imposition of the statutory maximum term applicable to Rossetti's felon-in-possession convictions (Counts 5 and 6). Dkt # 548 at 3-5, 8-10, 12; *see also* Dkt # 551 at 4-7, 22-23. At sentencing, the court imposed a sentence of 262 months on these counts. Dkt # 548 at 9-10.

violation of 18 U.S.C. § 1951 (Counts 1 and 2); carrying firearms and an explosive device – a grenade – during and in relation to a crime of violence, in violation of 18 U.S.C. § 924 (c) (Counts 3 and 4); and being a felon in possession of a grenade and firearms, in violation of 18 U.S.C. § 922 (g)(1) (Counts 5 and 6). The scheme to rob the Loomis facility was initially conceived by co-defendant Carmello Merlino with the generous assistance of Anthony Romano, a former convict and employee of Merlino's. Three other men were recruited over time to the venture: Merlino's nephew William Merlino, David Turner, and petitioner Rossetti (who was inducted into the group on January 13, 1999).[2] Fatal to the success of the enterprise was the fact that Romano was a government informant who assiduously tape-recorded his conversations with his fellow conspirators and routinely reported their plans to his handlers at the FBI.

On November 22, 2002, this court sentenced Rossetti to a total of 622 months in prison. Specifically, Rossetti was sentenced to 240 months for conspiracy and attempting to affect commerce by robbery (Counts 1 and 2), to be served concurrently with joint terms of 262 months for possessing a grenade and firearms as an armed career criminal[3] (Counts 5 and 6). Rossetti was additionally sentenced for carrying a

---

[2] By the time the men were arrested a month later on February 7, 1999 (the appointed day of the robbery), Rossetti, who was the crew member most experienced in criminal matters, had effectively assumed leadership of the group. As the government points out, "[o]n selecting the proper disguises, providing equipment, assigning roles, instructing the 'insider' guard, tying the guards, covering the tracks, driving getaway cars, Rossetti [was] the one taking the lead . . . ." Dkt # 580 at 19; *see also* Dkt # 551 at 9-10.

[3] An armed career criminal is defined in the Armed Career Criminal Act (ACCA) as one who "with the intent to engage in conduct which . . . constitutes [among other enumerated offenses] a crime of violence . . . [and] travels from any State or foreign country into any other State and acquires, transfers, or attempts to acquire or transfer,

2

firearm in relation to a crime of violence: 360 months for the grenade (Count 3) and 60 months for the handguns and rifle (Count 4), both to be served consecutively to the terms imposed on Counts 1, 2, 5, and 6. Rossetti filed an appeal challenging the validity of his sentence in light of *United States v. Booker*, 543 U.S. 220 (2005). The First Circuit Court of Appeals vacated the sentence and remanded the case for re-sentencing. Dkt # 516. On August 3, 2007, this court sentenced Rossetti again to a 622-month term of imprisonment. A new judgment entered on August 7, 2007. Dkt # 540. Following a further appeal, the First Circuit summarily affirmed the sentence. *United States v. Rossetti*, No. 07-2380 (1st Cir. 2008); Dkt # 557. On January 26, 2009, the United States Supreme Court denied Rossetti's petition for writ of certiorari, and Rossetti's federal convictions became final. *Rossetti v. United States*, 555 U.S. 1158 (2009).

Meanwhile, on August 4, 2008, Rossetti filed a motion for a new trial in the Boston Municipal Court (BMC), seeking to vacate a 1977 conviction for breaking and

---

a firearm in such other State in furtherance of such purpose . . . ." 18 U.S.C. § 924 (g). Ordinarily, an armed career criminal "shall be imprisoned not more than 10 years . . . ." *Id*. Because of Rossetti's three prior convictions for crimes qualifying as violent felonies, he was subject to an enhanced term of "imprison[ment for] not less than fifteen years. . . ." 18 U.S.C. § 942 (e)(1); *see also* Dkt # 551 at 4-10, Dkt # 548 at 3-4. As noted above, Rossetti now contests this sentence based on the vacatur of one of the prior state convictions.

3

entering (a "violent" felony for ACCA purposes).[4] While that motion was pending in state court, on January 26, 2010, Rossetti brought the instant § 2255 petition, seeking a new trial based on alleged ineffective assistance of counsel.[5] Rossetti, however, requested this court to "permit the instant motion to remain open pending determination of Rossetti's state convictions' validity." Dkt # 568-1 at 40. The United States filed an opposition on May 20, 2010, addressing only the ineffective assistance of counsel claim, to which Rossetti replied on September 16, 2010.[6] On February 10, 2011, the BMC granted Rossetti's motion for a new trial, vacating his 1977 conviction. Rossetti subsequently amended the § 2255 petition on April 15, 2011, seeking a re-sentencing in his federal case.[7] In response, the United States filed a second opposition on June

---

[4] Absent the three predicate convictions, this among them, Rossetti would have faced a Guidelines Sentencing Range (GSR) of 97 to 121 months instead of 262 to 327 months.

[5] According to the docket, the petition was received at the Clerk's Office on February 2, 2010. As the government concedes, Rossetti's petition is timely because it was hand-delivered to prison authorities on January 26, 2010, at the Allenwood Federal Correctional Complex. *See Morales-Rivera v. United States*, 184 F.3d 109, 109 (1st Cir. 1999) ("[A] pro se prisoner's [ § 2255] motion . . . is filed on the date that it is deposited in the prison's internal mail-system . . . .").

[6] In its opposition, the government responded to all of Rossetti's substantive contentions except the stay request with respect to the motion for a new trial pending in the BMC, which appeared on the first and last pages of his seventy-six page supporting memorandum. *See generally* Dkt # 580; *see also* Dkt # 568 at 3; Dkt # 568-1 at 40.

[7] In his supplemental memorandum (filed on April 11, 2011), Rossetti asks this court to consider his petition, which was originally filed under § 2255(f)(1), as a § 2255(f)(4) motion. Dkt # 602 at 5. As will be explained, this request is based on Rossetti's misapprehension of how § 2255(f) operates and is moot given the Supreme Court's holding in *Johnson v. United States*, 544 U.S. 295, 296 (2005).

1, 2011.¹⁰ On July 18, 2011, Rossetti filed his final reply.

DISCUSSION

Section 2255 is not a substitute for direct appeal, but rather provides post-conviction relief in four limited instances: "if the petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998). "The catch-all fourth category includes only assignments of error that reveal 'fundamental defect[s]' which, if uncorrected, will 'result[ ] in a complete miscarriage of justice,' or irregularities that are 'inconsistent with the rudimentary demands of fair procedure.'" *Id.*, quoting *Hill v. United States*, 368 U.S. 424, 428 (1962). In other words, a cognizable § 2255 claim that does not raise constitutional or jurisdictional issues must reveal "exceptional circumstances" that compel redress. *Id.* The petitioner bears the burden of demonstrating an entitlement to relief. *Mack v. United States*, 635 F.2d 20, 26-27 (1st Cir. 1980).

**Ineffective Assistance of Counsel**

Rossetti contends that he did not receive constitutionally effective assistance from William Cintolo, his trial attorney. Rossetti makes three claims in this regard: (1) that Cintolo (erroneously) advised Rossetti against testifying in his own defense; (2) that Cintolo failed to adequately examine two defense witnesses – Irene Rossetti,

---

¹⁰ The principal argument advanced by the United States against Rossetti's re-sentencing is that the request is "time barred under 28 U.S.C. § 2255(f)." Dkt # 598 at 3.

5

Rossetti's mother, and Sharon Mills, a co-worker of Rosetti's at Zam-Tek; and (3) that Cintolo's purported contractual relationship with a government informant who was allegedly involved in a "related" and unsolved high profile criminal investigation constituted a conflict of interest that adversely affected his performance on Rosetti's behalf.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." The right to counsel includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To be effective, a lawyer need not be perfect. "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [should] be made to eliminate the distorting effects of hindsight." *Id*. at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

In evaluating the constitutional effectiveness of an attorney's representation, a court is to engage in a two-step inquiry. "First, a reviewing court must assess the proficiency of counsel's performance under prevailing professional norms. This evaluation demands a fairly tolerant approach; after all, the Constitution pledges to an accused an effective defense, not necessarily a perfect defense or a successful defense." *Scarpa v. Dubois*, 38 F.3d 1, 8 (1st Cir. 1994) (internal citations omitted). To satisfy this first prong of the *Strickland* test, Rossetti must show that Cintolo's performance was deficient to the point of being objectively unreasonable. *See United States v.*

6

*McGill*, 11 F.3d 223, 226 (1st Cir. 1993). Reasonable conduct is conduct that falls "'within the range of competence demanded of attorneys in criminal cases.'" *United States v. Bosch*, 584 F.2d 1113, 1121 (1st Cir. 1978), quoting *McMann v. Richardson*, 397 U.S. 759, 770-771 (1970). To satisfy the second *Strickland* prong, Rossetti must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

*Rossetti's Decision to Refrain from Testifying in His Own Defense*

Rossetti claims that "[Cintolo] was ineffective for failing to ensure [his] constitutional right to testify in his own defense." Dkt # 568 at 8. Rossetti does not claim that he was unaware that he had the right to testify, or that he did not personally make the decision not to take the stand. Rather, Rossetti asserts that his waiver of the right to testify was unduly influenced by Cintolo's "erroneous . . . and insufficient advice . . . ." *Id.* He specifically faults Cintolo's legal judgment that his proposed testimony (which entailed an admission that he continued to offer assistance to the conspirators after the point at which he allegedly withdrew from the plot) would "nullify" any legal claim to a potentially viable withdrawal defense based on other less-incriminating evidence.[11] Rossetti alleges – and Cintolo appears to agree[12] – that this

---

[11] "I believed at that time that [Rossetti's] subsequent actions with his co-conspirators nullified his prior withdrawal from the conspiracy, *since he never completely disassociated himself from the conspiracy*." Dkt # 568-3 at 31 (emphasis added). Rossetti claims that crucial components of the "other evidence" that was to establish a withdrawal defense was not introduced at trial as a result of Cintolo's negligence. Dkt # 568 at 17-25.

[12] *See* Dkt # 568-3 at 28, 31.

7

advice was based on an "erroneous withdrawal theory of law," *id*. at 10.[13] The short answer is that the Cintolo's advice was based on an essentially correct assessment of the law. "We have made manifest that in order to withdraw from a conspiracy, 'a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy.' . . . Typically, that requires 'either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.' . . . After all, '[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal' from a conspiracy." *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002), quoting *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam).

Moreover, even if the advice was erroneous, there was no prejudice to Rossetti as the withdrawal defense was a chimerical fantasy given the evidence developed at trial. As the government aptly summarizes:

> Rossetti's claim that he precipitously abandoned the conspiracy [the night before the robbery] . . . is highly implausible as at the same time he proposes that he had no choice but to participate in the robbery due to the threat of death by Carmello and Romano [which Rossetti raises for the first time against Carmello conveniently after the latter's death]. Moreover, Rossetti's conduct on February 7th thoroughly contradicts his profession of withdrawal. He acted consistently with the plan for the robbery drawn up over months of preparation, showing up at a predetermined time and location with weapons, a hand grenade, and other robbery paraphernalia he always intended to bring.

Dkt # 580 at 16-17. In light of these facts, Cintolo's assessment that Rossetti's

---

[13] Rossetti proposed to testify to an alleged offer that he made to Turner and Carmello Merlino to dispose of the getaway car prior to the robbery, arguing that it would have demonstrated an affirmative act inconsistent with the object of the conspiracy sufficient to establish withdrawal. *See id*. at 16-17.

8

proposed testimony would have done more harm than good in the eyes (and ears) of the court and jury was objectively reasonable.[14]

*Failure to Properly Question Defense Witnesses*

Rossetti next takes issue with Cintolo's direct examination of two defense witnesses: (1) Irene Rossetti (Rossetti's mother); and (2) Sharon Mills, a co-worker of Rossetti's at Zam-Tek. With regard to his mother, Rossetti asserts that Cintolo omitted to ask a key question that would have prompted her to relate a visit he had paid her the night before the robbery and his statement to her that he had "just backed out of [a business deal]."[15] Rossetti argues that this testimony would have supported a withdrawal defense, since the "business deal" might plausibly have been understood by the court and jury as a reference to the robbery scheme. The statement – even in the unlikely event of its being admitted for its truth – would have added nothing by way of support for a withdrawal theory in light of the overwhelming evidence of Rossetti's unwavering participation in the preparations for the robbery.[16] Hence, there was no prejudice in the omission. The same is true with respect to Rossetti's assertion that

---

[14] Rossetti alternatively claims that Cintolo's counsel was insufficient for failing to explain "the negative consequences of him not testifying . . . especially how it would affect his affirmative defense of entrapment." Dkt # 568 at 10. The argument is unavailing. The jury rejected any defense of entrapment in light of the overwhelming evidence of Rossetti's predisposition to commit the robbery.

[15] Dkt # 568-1 at 59.

[16] The surreptitious recordings made by Romano reveal Rossetti "walking the crew through each detail of the robbery plot . . . , volunteering to drive one of the gateway [sic] cars 'to smash guys out of the way'; to tie the guards; to 'tak[e] down' anyone who came through the door of Loomis Fargo; and to bring whatever equipment that was needed for the robbery . . . [and] gloating about his prior experiences with armed robberies and other criminal conduct." Dkt # 580 at 19.

Cintolo should have discredited the testimony of Sharon Mills (his own witness), when she testified to facts that were purportedly inaccurate.[17] Specifically, when Mills was asked to describe Nextel's billing practices in 1999 for calls dialed but not answered from its cell phone subscribers, she stated that Nextel charged customers for dialed calls regardless of whether they were ultimately answered. Rossetti alleges that Cintolo failed to verify the accuracy of Mills' understanding of the way that Nextel billed – as he had said he would[18] – by way of an independent investigation or expert witness. Rossetti's theory is that a correction of Mills' testimony would have refuted the government's theory that Rossetti and Turner were using a Nextel cellular phone (belonging to Zam-Tek) on the morning of the robbery to communicate with one another and the other conspirators. Dkt # 568-1 at 63-65. Even if Mills was mistaken, the error is immaterial because the government did not rely on Mills' statement either in its case-in-chief or in its summation.[19]

*Conflict of Interest*

Rossetti next contends that Cintolo's performance at trial was hindered by a

---

[17] Rossetti claims that he has confirmed the factual inaccuracy of Mills' statements by way of a post-trial investigation conducted by forensic intelligence analyst, Angela Clemente. Dkt # 568-1 at 62; *see also* Dkt # 568-3 at 38-40.

[18] In his affidavit, Cintolo admits that he failed to inquire into Nextel's billing practices. Dkt # 568-3 at 28, 32.

[19] In his memorandum, Rossetti seeks (1) "a preservation order on the Nextel phone which is in the government's custody," Dkt # 568-1 at 24, (2) "permission to have an electronics expert extract any data stored on the Nextel's memory chip," *id*. at 24-25, and (3) " a restriction order that any and all further handling of the Nextel [phone] prior to testing be done by the United States Attorney's Office." *Id*. at 25. These requests are denied.

conflict of interest arising from an allegedly undisclosed contractual relationship that he had entered with a government informant (Chicofksy). Because Rossetti did not object to the alleged conflict of interest at trial, he must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance" in order to show a violation of the Sixth Amendment sufficient to warrant a new trial. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). To show an adverse effect, a defendant must identify an alternative defense strategy that might plausibly have been pursued but for the attorney's divided interests or loyalties, *United States v. Ramirez-Benitez*, 292 F.3d 22, 30 (1st Cir. 2002), "'such as eliciting (or failing to elicit) evidence helpful to one client, but harmful to the other.'" *McFarland v. Yukins*, 356 F.3d 688, 701 (6th Cir. 2004). If a defendant makes the requisite showing, "prejudice will be presumed and the defendant need not demonstrate [as would be the case under *Strickland*] a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would have been different." *Rubin v. Gee*, 292 F.3d 396, 401-402 (4th Cir. 2002). *See United States v. Segarra-Rivera*, 473 F.3d 381, 385 n.2 (1st Cir. 2007) (distinguishing claims in which counsel is alleged to have performed incompetently, which require a showing of prejudice, from claims in which a defendant succeeds in showing that counsel "labored under an actual conflict of interest," which may trigger relief "without regard to proof of prejudice"). *Sullivan*, in other words, carves out a middle ground between *Holloway's* automatic-reversal rule and the showing-of-prejudice requirement of *Strickland*. (*Strickland* prejudice requires a showing of the probability of a different outcome, not simply a showing of an effect on counsel's performance. *See Allison v. Ficco*, 388 F.3d 367, 370 (1st Cir. 2004)). "Although this standard was first developed

11

in the context of counsel's joint representation of criminal defendants, it has been applied generally to other conflict of interest situations . . . ." *United States v. Soldevila-Lopez,* 17 F.3d 480, 486 (1st Cir. 1994), citing *United States v. Rodriguez*, 929 F.2d 747, 749 (1st Cir. 1991).

An actual conflict of interest is a conflict that adversely affects counsel's performance, "as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). An actual conflict of interest arises when an attorney subordinates his duty to his client to other interests or loyalties and "pulled his punches" as a result. *People v. Doolin*, 198 P.3d 11, 34 (Cal. 2009). *See also Soldevila-Lopez,* 17 F.3d at 486. An actual conflict will be found to exist where an attorney's self-interest displaces his or her loyalty to the client. *See Campbell v. Rice*, 265 F.3d 878, 887 (9th Cir. 2001), *further proceedings*, 408 F.3d 1166 (9th Cir. 2005) (en banc) (petitioner's counsel, who was being prosecuted by the same district attorney's office, "was caught between the rock of her legal obligation to zealously defend [the petitioner] and the hard place of her instinctive desire to 'save [her]self.'"). An actual conflict will also be found where loyalty to a third party supplants the attorney's duty to the client. *See Commonwealth v. Martinez,* 425 Mass. 382, 392 (1997) (defendant's counsel maintained a presumptively prejudicial client relationship with a prosecution witness).

The substance of Rossetti's conflict of interest claim is as follows. At some point after his arrest and before trial, Rossetti came to believe that he had been targeted by the government because of his purported knowledge of those responsible for the

12

high-profile robbery of paintings from the Isabella Stewart Gardner Museum. Dkt # 568-1 at 25, 28-29. Rossetti also states that he had come to suspect that Chicofsky was cooperating with the government in the Gardner investigation. Rossetti asked Cintolo to undertake an investigation of Chicofsky to verify whether he was an informant and, if so, to call him as a defense witness to buttress the entrapment theory. Without any real evidence, Rossetti alleges that Cintolo's reluctance to call Chicofsky as a witness stemmed from a secret agreement under which Cintolo was to receive "one-third of the five million dollar reward [Chicofsky was slated to get from the government] to facilitate" Chicofsky's cooperation with the FBI in the Gardner investigation. *Id*. at 25, 33. Rossetti further alleges that Cintolo himself admitted to his contractual arrangement with Chicofsky, but only after Chicofsky's status as a government informant was exposed in another trial.[20] *Id*. at 32-33.

As the government notes, Rossetti's attempt to inject Chicofsky into his case "echoes the familiar refrain [raised and rejected as irrelevant and tangential] throughout the proceeding. . . ." Dkt # 580 at 25. Specifically, Rossetti's co-defendant Turner "took the lead in filing post-trial motions alleging that Chicofsky's testimony would

---

[20] Rossetti asserts that Cintolo made this disclosure hurriedly as he was "rushing out" to another meeting. *See* Dkt # 568-1 at 33. In addition, Rossetti claims that "[Cintolo had] put a copy of the contract [between him and Chicofsky] in Rossetti's case file." No copy of any such contract has been produced by Rossetti, nor did it appear in the proceedings involving Turner's similar claims about Chicofsky and his relationship with the FBI. Rossetti further alleges that another attorney (Burke) was present at the meeting when Cintolo made the alleged disclosure and "as a result of this meeting, Burke filed an affidavit in this case (attached hereto as 'Exhibit G'), detailing some of Chicofsky's disclosures in support of Turner's post-trial motion for discovery." Dkt # 568-1 at 34. The referenced "Exhibit G" appears nowhere in Rossetti's pleadings.

13

have disclosed the FBI's plot to use the Loomis Fargo criminal charges as leverage to locate the stolen Gardner paintings." *Id*. at 26. Rossetti eventually joined Turner's motions. *Id*. The First Circuit's response to Turner on the Chicofsky entrapment issue applies equally to Rossetti: "Turner's presentation continues to focus on the FBI's potential motive to entrap him, while ignoring the more significant issues of inducement and predisposition." *United States v. Turner*, 501 F.3d 59, 74 (1st Cir. 2007).

Despite the implausibility of the allegation of a "contract" with Cintolo (under which Chicofksy for no apparent reason was to share with Cintolo the reward offered by the Gardner Museum for information leading to the recovery of the paintings), there was no adverse effect on Cintolo's performance, as Chicofsky had nothing to contribute to Rossetti's defense. None of the thirty-eight "302" reports on the FBI's dealings with Chicofsky (which the court ordered produced in the Turner proceedings) even mentions Rossetti.[21] As became clear in the Turner proceedings, even if called, there was no likelihood that Chicofsky would have testified as, among other reasons, his intimations that he possessed information about the Gardner robbery appear to have been part of a scam motivated by the reward offered for the paintings' return.[22]

---

[21] Rossetti's related discovery request for all of the government's files relating to his relatives and the Gardner investigation is denied. The court accepts the government's representation that "the review of the FBI files conducted personally by an Assistant United States Attorney who prosecuted Rossetti and his co-defendants revealed no connection whatsoever between Rossetti and the Gardner investigation." Dkt # 580 at 26; *see also* Dkt # 580 at 26 n.6.

[22] When called, Chicofsky was adamant in his invocation of his Fifth Amendment privilege against self-incrimination. Moreover, as this court observed at the conclusion of the hearing on the Chicofsky-based claims raised by Turner: "I see no reason to revisit the subject of attempting to elicit testimony from the reluctant Chicofsky. Even assuming that Chicofksy could be persuaded to waive his Fifth Amendment privileges

**The Vacatur of Rossetti's Prior State Court Conviction**

Finally, Rossetti requests that his sentence be modified to reflect the vacatur of his 1977 conviction (for breaking and entering) by the BMC. Dkt # 601-1 at 1-2.[23] This state conviction was one of three prior convictions cited by the government in arguing for an enhancement of the sentence on Rossetti's felon-in-possession convictions (Counts 5 and 6). Dkt # 548 at 3-5, 8-10, 12; *see also* Dkt # 551 at 4-7, 22-23. The court ultimately imposed an enhanced sentence of 262 months on these counts. Dkt # 548 at 9-10. In light of the vacatur, Rossetti argues that he is entitled to a reduction of his sentence to a range similar to the one imposed on Turner, who received a sentence of 100 months on the same counts. Dkt # 473 at 2. At issue is whether Rossetti's post-vacatur request for re-sentencing is time-barred by 28 U.S.C. § 2255(f), which states:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —
>
> **(1)** the date on which the judgment of conviction becomes final;

---

and testify . . . given Chicofsky's record of unreliability, [such testimony would have proved] more likely hurtful than helpful to Turner's defense." Dkt # 456 at 5; *see also* Dkt # 495 at 18.

[23] The government notes the somewhat unusual circumstances in which the vacatur issued: "It appears Rossetti succeeded . . . without presenting any factual support for his claim, aside from his bold assertions . . . . The Boston Municipal Court allowed Rossetti's Motion for New Trial without holding an evidentiary hearing . . . . It appears that in ruling on Rossetti's [motion] the Boston Municipal Court did not make any findings of fact. The Suffolk District Attorney's Office may be filing a motion with the Boston Municipal Court requesting findings of fact with respect to the vacatur of Rossetti's conviction." Dkt # 598 at 9. Whether the Commonwealth is proceeding with an appeal is unknown to the court.

**(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

**(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Under the strict terms of the statute, Rossetti's motion is timely only if it was filed within a year of the latest of the four specified dates. Of these, only § 2255(f)(1) and (f)(4) potentially apply. Under § 2255(f)(1), the 1-year limitation period began to run on January 26, 2009 – the date on which Rossetti's convictions became final after his petition for writ of certiorari was denied by the United States Supreme Court. Accordingly, Rossetti's claim is time-barred under this section because he failed to raise a cognizable § 2255 claim on vacatur grounds until April 11, 2011,[24] well over two years after his federal convictions became final.[25]

Under § 2255(f)(4), the would-be trigger date is not readily apparent from the

---

[24] *See* Dkt # 596; *see also* Dkt # 601.

[25] In his original 2255 petition, Rossetti stated that he had "filed two separate motions for new trial on his [state] convictions," Dkt # 568-1 at 40, and requested this court to "permit the instant motion to remain open pending determination of Rossetti's state convictions' validity." *Id.* As the government argues, however, these statements "[were] merely . . . placeholder[s] for the subsequent, albeit wholly speculative, occasion when the state court would vacate Rossetti's armed career criminal predicate conviction." Dkt # 598 at 5. Further, under a long-standing canon of statutory construction (the Whole Act Rule), "allowing a petitioner to assert [such] speculative claims as 'placeholders' in a timely § 2255 petition with the hope that some of the claims materialize down the road, even if outside the 1-year limitation period set forth in § 2255(f)(1), would eviscerate the exceptions in § 2255(f)(2-4)." *Id.* at 4.

16

face of the statute. In *Johnson v. United States*, 544 U.S. 295, 296 (2005), the Supreme Court held, *inter alia*, that the "1-year limitation period [under § 2255 (f)(4)] begins to run when the petitioner receives notice of the order vacating the prior conviction . . . ." Thus, Rossetti's claim would appear to survive, having been filed just over two months after he received notice on February 10, 2011, from the BMC of the vacatur of his 1977 conviction. But the *Johnson* Court added a significant caveat.[26] "[W]e also hold that [§ 2255(f)(4)] allows the fact of the state-court order to set the 1-year period running *only if the petitioner has shown due diligence in seeking the order*." *Id*. at 302 (emphasis added).[27] On this issue, the Court was very precise: "[D]iligence can be shown by prompt action on the part of the petitioner *as soon as* he is in a position to realize that he has an interest in challenging the prior conviction *with its potential to enhance the later sentence*." *Id*. at 308. (Emphases added). After discussing several options, the Court specified the date on which judgment enters as

---

[26] Although the due diligence requirement is set out in the text of § 2255(f)(4) – and as such, applies to all claims filed under that subsection – the *Johnson* Court clarified the significance of the requirement in the context of when the vacatur of a predicate state conviction is alleged as "the fact[ ] supporting the claim" under § 2255 (f)(4). In fact, the primary threshold question presented to the Court was whether such vacaturs constituted "a 'fact' supporting [the] 2255 motion" under § 2255(f)(4). *See Johnson,* 544 U.S. at 302.

[27] Of particular concern to the Court was preserving the central purposes of the Antiterrorism and Effective Death Penalty Act (AEDPA) – enacted in 1996 to amend 28 U.S.C. § 2255 to its current form – which include balancing federal courts' interests in the finality of their sentences against state courts' interests in minimizing collateral litigation over prior convictions later used to enhance sentences in federal prosecutions. *See Johnson,* 544 U.S. at 307-310. Guarding against unreasonable delay on the part of the petitioner was important, to avoid the "serious problem . . . [of petitions being claimed as timely] as long as he brings it within a year of learning he succeeded in attacking the prior conviction, *no matter how long he may have slumbered before starting the successful proceeding*." *Id*. at 307 (Emphasis added).

the point at which a putative petitioner should know that diligence is required. "After the entry of judgment, the subject of the § 2255 claim has come into being, the significance of inaction is clear, and very little [collateral] litigation would be wasted, since most challenged federal convictions are in fact sustained." *Id.* at 309.

The bottom line for a post-*Johnson* § 2255 petitioner is that a renewed 1-year limitation period begins to run on receipt of the notice of the vacatur of the prior state conviction, *only if* the vacatur was pursued with due diligence after the entry of judgment in the federal court.[28] Applied to Rossetti's claim, what appears to be a straightforward rule is complicated by the fact that Rossetti was sentenced twice in this case: initially on November 22, 2002, and again on August 3, 2007, after a remand following the Supreme Court's decision in *Booker* – with judgments entering on November 27, 2002, and on August 7, 2007, respectively. Of the two dates, the fixing of the earlier date as the due diligence trigger point for purposes of § 2255(f)(4) is more consonant with the rationale of *Johnson* and with Congress's intent in imposing a strict statute of limitations on AEDPA claims. It was, after all, the November 27, 2002 judgment that first put Rossetti on notice that he had an interest in challenging the 1977 conviction. *See Johnson,* 544 U.S. at 308.[29]

---

[28] The petitioner in *Johnson*, however, could not establish that he had sought vacatur of his prior state conviction with due diligence, because he had waited more than three years after the entry of judgment in his federal case to challenge his predicate state conviction (by filing a state habeas petition). *Id.* at 311.

[29] As with the petitioner in *Johnson,* this court observes with respect to Rossetti that "there is every reason to believe that prompt action would have produced a state vacatur order well over a year before he filed his § 2255 petition . . . ." *Johnson,* 544 U.S. at 311. For his part, Rossetti argues "the prior to *Johnson*. . . [the First Circuit's adherence to a contrary rule under] *Brackett* left Rossetti in a practical bind because

18

Moreover, it is impossible to overlook Rossetti's inaction over the nearly *six-year period* from the date of the initial judgment (November 27, 2002), to the date he first challenged his state conviction (August 4, 2008), *id.* at 309, a period of prolonged inattention nearly double that which proved fatal to the petitioner in *Johnson*. *Johnson*, 544 U.S. at 311. The court also notes that Rossetti's *Booker* resentencing was a fortuity that had no relationship with any litigation effort on Rossetti's part, nor was it an eventuality so reasonably foreseeable so as to excuse Rossetti's dilatoriness. Finally, under *Johnson*, Rossetti's *pro se* status is not a mitigating factor. "[W]e have never accepted *pro se* representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness." *Id.*

ORDER

For the foregoing reasons, Rossetti's motion to vacate, set aside, or correct his sentence is <u>*DENIED*</u>. The petition is <u>*DISMISSED*</u> with prejudice. The Clerk will enter the dismissal and close the case. The court will consider a request for a Certificate of Appealability focused on a specific issue(s) raised by this decision if filed within thirty (30) days of today's date.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

he could not bring a § 2255(f)(4) [petition] once he vacated a predicate state conviction since he 'was aware of the facts supporting his claim that his state court conviction was invalid' – that he was given an infirm colloquy – 'long before the date of his federal sentencing.'" Dkt # 602 at 8, quoting *Brackett v. United States*, 270 F.3d 60, 69 (1st Cir. 2001). Yet, even after *Brackett* was overruled by *Johnson* in 2005, Rossetti still waited until August 4, 2008, over three years, to attack his predicate state conviction.